The Assistant Vice-Chancellor.
The defence to the original suit, on the part of Gordon, is that the four judgments claimed by Draper, were paid off and satisfied by means of the consideration on which they were assigned to him, being furnished and advanced by Brown, out of the property of the firm of Gordon & Brown. This is the summary of the defence at the conclusion of the answer. It is previously stated with a detail of the circumstances, which I will briefly recapitulate.
C. F. Joy, of Boston, owed Gordon & Brown $5,450 in negotiable bills and notes, which were in the hands of Brown. Gilchrist & Co., of New York, owed the same firm about $600. Brown, conspiring with Draper, to injure and defraud Gordon, induced Draper to apply for an assignment of the judgments, offering about $5000, and Brown agreeing to furnish to him the amount to be paid; and an assignment was obtained accord *214 ingly, and Brown furnished and advanced to Draper the amount which he paid to obtain it, out of the property of the firm of Gordon & Brown. The debt of Gilchrist & Co. was a part of the consideration of the assignment of the judgments, and Brown permitted Draper to turn it over to the Lewis County Bank. The residue of the consideration, was furnished by Brown to Draper, out of the bills receivable of Joy due to the firm, and the same was used by Draper to purchase the assignment.
The charge is reiterated in a variety of forms, that the entire and only consideration paid by Draper, was furnished by Brown out of the assets of Gordon <fc Brown ; that Draper really and in fact never advanced of his own property or funds, any amount whatever towards procuring the assignment; but it was procured solely by the funds and property of Gordon & Brown.
The allegations in the cross bill, are not to be regarded in this part of the case, otherwise than as they amplify these statements ; because a cross bill is a defence, and the matters upon which it is founded must he stated in the answer to the original suit, as well as in the cross bill. This fundamental rule will be found laid down in Irving v. DeKay, 10 Paige, 319,322 ; Galatian v. Erwin, Hopkins, 48, 58, and 8 Cowen, 361; Field v. Schieffelin, 7 J. C. R. 250 ; May v. Armstrong, 3 J. J. Marsh. 262.
In reference to the defence set up in Gordon’s answer, the proof falls wholly short of sustaining it. So far from that, the proof is undoubted, that the consideration paid by Draper for the assignments, was advanced by him out of his own property, and no part of it was furnished to him by Brown. Whatever may be the effect, in this case, of proving that Brown agreed to indemnify Draper, or that he did subsequently pay to Draper more than the advance made by the latter; it is perfectly clear that it does not apply to the issue made by the answer to the original bill.
The debt of Gilchrist & Co., which the answer states as a part of that consideration, was not turned over by Draper to the / bank. It was reserved by the parties to the assignment, as a debt which they had already acquired by Curtis, Easton & Co.’s suit in this court against Gordon & Brown; and it does not ap *215 pear that the bank, or those parties, have ever acquired any other right to the Gilchrist debt, than that secured by the chancery proceeding.
The next inquiry is upon the case made by the cross bill, and here Gordon is met with the objection that the testimony taken in the cross suit cannot be read in the original cause.
Where the point in issue is the same in both suits, and no testimony has been taken in the original suit, and the cross bill was filed in time, it seems that the depositions taken in the cross suit may be read in both causes where they are heard together.
So far, the objection is not well taken; but it goes much farther.
This is a cross bill, having, it is true, two objects ; first, a discovery in aid of the defence to the original bill, and secondly, the cancellation of the judgments on which that bill is founded; but the relief asked, can only be granted on proof of facts which would be a perfect defence to the original bill.
The defendant having made his defence by an answer to that bill, has exhibited a cross bill setting up another state of facts which he insists is a good defence to the judgments, and entitles him to have them discharged.
This new state of facts, as has already been shown, is inadmissible in the original suit, because it is not in issue there.
The question is, can it be made available in the cross suit, when it is not available in the former ?
In other words, shall a defendant, by a cross bill, have the benefit of a defence to the original suit, which was known to him when he answered, which there was nothing to prevent him from stating, and which he has, nevertheless, omitted to set up in such answer? I think he cannot. If a defendant at law in a suit on a bond, after pleading payment solely, should file a bill of discovery in respect of the payment, and also alleging fraud in procuring the bond, and asking a discovery in regard to that also, and that the bond should be given up; this court would refuse the latter branch of the discovery, and all the relief sought, because of his omission to interpose his defence in the suit at law. If he had pleaded the fraud at law, the discovery would have been entertained. (See Crane v. Bunnell, 10 Paige, 333.)
*216 So here, if the answer to the original bill had set up the additional grounds for relief contained in the cross bill, (assuming them to be valid,) and thereupon the latter had sought a discovery of those matters, and the consequent relief; the court could have regarded the whole cross bill as a defence in the first instance, and on its being made out, could consistently refuse the relief sought in the first bill, and grant that asked in the cross suit:
As the case now stands, the matter is in this position. Gordon has failed to show a defence to the original bill, and Draper is entitled to a decree ; but Gordon claims that in his attack on Draper, he has shown that the latter ought not to have satisfaction, but should cancel the judgments. The cross suit fails as a defence, but it is claimed to have the same benefit derived from it by way of attack, and virtually as a separate suit.
This is wholly incongruous, and would lead to endless confusion. The relief prayed in the cross suit, does not alter the case, because, in order to reach it, the party must first establish what would have been a good defence to the original bill.
I find nothing decisive in the books on this point, but considering the scope and object of cross-bills, I can entertain no doubt about it.
As illustrating the question, I refer to Christian v. Wrenn, Bunb. 321, where, on a bill for tithes, the defendant set up in his answer a modus of 11 d. for every tenth lamb, “and so in proportion for a less number and then filed his cross bill to establish his modus, but in stating it, omitted the words which I have quoted ; he was not allowed, on the hearing, to read the depositions taken in the original cause, as evidence in the cross cause, (although he had obtained an order to warrant it,) because the modus set up in the cross-bill was different from that insisted upon in his answer to the original bill.
In the case of Wilford v. Beaseley, 3 Atk. 501, cited by the counsel for Gordon, Lord Hardwicke refused to suffer the evidence in a cross cause, to be read touching the matters in issue in the original cause after a decree in the latter; clearly showing that when the party has neglected to make his defence in the original suit, he shall not avail himself of it by starting it in a cross suit. And in the same case, Lord Hardwicke allowed *217 depositions to be read in the cross cause, not relating to the matters put in issue in the original cause. The report does not show what those matters were, but they must necessarily have been entirely collateral to the original cause; for what related to that cause was excluded. Besides the attempted defence, the cross bill may have brought forward some counter demand against the adverse party. (See also 1 Howard’s Exch. Practice, 294.)
As the matter of the cross bill in this case cannot be entertained as a defence to the original cause, by reason of the omission to put it in issue there; it cannot be allowed indirectly to become a defence, on the ground of its entitling the defendant to have the subject matter of the original suit given up. The rule that every defence which might have been set up in a suit, is cut off by a judgment or decree, whether it were actually made or not, ought to apply to a defence first made by a cross-bill which might have been set up in the answer.
I am convinced that I have no right to receive against Draper, to affect his recovery in the original suit j the testimony taken in support of the new case made by the cross-bill.
The question just discussed is new in its application, and I may have erred in my conclusion. For this reason, having considered the case on the cross-bill, and formed a judgment upon it, it is proper that I should state the result. This will be done in as brief terms as possible.
The cross-bill goes on the ground that Brown induced Draper to buy the judgments for his benefit; having before or at the time of the purchase, put into Draper’s hands, the bills receivable of Joy amounting to $5300, and enough with the debt of Gilchrist & Co. to make up more than the $5000, which Draper was to pay for the judgments. The agreement made for the purchase is thus stated in the cross-bill. It was agreed between Mr. Bennett, (the agent of the Lewis County Bank and Curtis and others,) Draper, and Joy, Brown consenting thereto, that Joy should discontinue his suit, pending virtually against the bank, for the butter which he had bought of Gordon & Brown, and which the bank had seized, and the sheriff had sold on attachment; and should receive the proceeds of the sale from *218 the sheriff; that $1700, should be allowed to him by the bank for his damages and costs, and Joy should be credited that amount on the bills which he gave for the butter, then in the hands of Draper, and should pay the balance to Draper ; that the same $1700, should go to reduce the sum of $5000, Draper was to pay the bank for the judgments ; leaving $2700, to be paid by Draper in cash after crediting the debt of Gilchrist & Co.; and the agent, in consideration of the $5000, thus to be paid and the discontinuance of Joy’s suit, agreed to assign the judgments to Draper. The cross-bill then states, that owing to a temporary absence of Joy when the agreement was carried into effect, Draper advanced the $2700, for Brown, for a few days and until Joy’s' return, upon the faith of Joy’s bills receivable so held by Draper. That on Joy’s return a few days thereafter, Draper sent Brown to Joy with those bills, who received over $3700, from Joy therefor, and forthwith paid to Draper the $2700, in full indemnity and reimbursement to him for his advance.
Thus, while the answer sets up an actual use of Gordon <fc Brown’s money and property in the purchase, furnished to Draper in advance ; the cross-bill proceeds upon a previous indemnity to Draper by a deposit of the bills receivable, the furnishing of the Gilchrist & Co. debt for the purpose, and the refunding to Draper of his temporary and accidental advance of the $2700, in a few days after it was made.
It will be perceived that there is one allegation in the cross-bill, which is indispensable to its whole case, viz. that when the agreement was made and the money paid by Draper, he had in his hands the bills receivable of Joy. Because any naked promise of indemnity by Brown, or any expectation or reliance upon being made good or secure, is not only not in issue, but it would not furnish any ground for the claim that it was Brown’s purchase.
Draper denies in his answer to the cross-bill, that he had those or any securities in his hands on that occasion ; and the answer is not disproved.
Mr. Bennett testifies respecting that arrangement, as if the suit were one by the bank, to set it aside on account of some imposition practiced upon him, He is entirely mistaken as to *219 the Gilchrist & Co. debt forming any part of the price between the bank and Draper. The assignment which he aided to draw up, proves his mistake. He was evidently confounding at the time of the transaction, as well as when testifying, the amount which the bank would realise and save by the operation, with the amount which Draper was to pay. His very erroneous idea of the sum in the sheriff’s hands ; and his singular conviction that Draper at last offered him $100, beyond what he was secured, when he at the same time says that Draper was to receive the whole of Joy’s bills, and was indemnified $3100, besides; together with his confusion on the points already mentioned; admonish me that his recollection is not sufficiently accurate to be relied upon to prove the very words used in the numerous conversations he had with Draper, and when the past tense and the future applied to such words, would so much change their effect.
The testimony of Curtis is still less satisfactory. He is very confused as to dates, had forgotten to a surprising extent the business upon which he visited Boston ; and what he says as to Draper waiting for the money from the sheriff and from Joy, is explained by his testimony that Draper was ready to pay without that money, and the fact that Joy was absent and the bank would not deliver the transfers until Joy’s suit was at an end.
The testimony of White is to prove an admission relating to a date subsequent to the transfer, and if it prove Draper had the bills receivable in March, it does not affect the point immediately under consideration. As in the instance of Mr. Bennett, if the witness had said “was to hold,” instead of “held,” the whole aspect of the evidence would have been changed. I ought to observe that the accuracy of White’s memory, is very much shaken by the several Boston witnesses who were present at some of the interviews between him and Draper.
The evidence of Joy, while it shows Draper negotiating with him in behalf of Bennett, and that he paid his acceptances to Brown, tends to prove that Brown had them when the assignment of the judgments was negotiated and executed. They were at some period, sealed up and deposited by Brown in Draper’s iron safe: but the time when, or how long, this witness *220 does not state; and so far as he does testify, it seems that they were not then under Draper’s control.
In short, I do not consider it proved that Draper had in his possession the bills receivable of Joy, when he contracted for the judgments, nor when they were assigned to him ; or that he was secured or indemnified by Brown on either of those occasions.
The statement of the cross-bill is in other respects widely variant from the proof. The contract as to the assignment, was between Draper and the holders of the judgments. The assignment itself, shows that Joy was not a party to it, and the evidence is to the same effect. The settlement between Joy and the bank, was a condition precedent, but it was a distinct contract from the other. Then as to the bargain between Bennett and Draper. There was no agreement to pay $5000, or to turn over the debt against Gilchrist & Co., or to pay'Joy’s damages. It was a simple agreement to pay $2700, leaving the bank to retain the debt of Gilchrist & Co.
I suppose the facts were really, as I will now state them.
Gordon & Brown on their failure, believed that they had been seriously overdrawn by Curtis, Easton & Co.; and that in justice, the bank ought not to collect of them the whole amount of the drafts. Hence, the controversy with the bank and the drawers; and to gain time to effect an adjustment, Gordon withdrew to New Jersey, and Brown to Boston, each having a part of the joint assets. Gordon became satisfied that Brown had injured the firm, by the large credits to his Boston house, Gove, Brown & Co,; and insisted on Brown’s furnishing the whole or greater part of the amount required to pay the claims in question. From this arose the quarrel between Gordon and Brown, and when the claims might have been settled for $5000, Gordon insisted on Brown’s furnishing the whole sum, and Brown refused to furnish it; so that through their mutual stubbornness, the opportunity was lost.
Then Mr, Bennett went to Boston to endeavor to sell the demands, and being more alarmed, and less informed, about the suit of Joy, than was reasonable; he sold them at a great discount, Draper was a creditor of Gove, Brown & Co,, and-every *221 thing he could make by this purchase, would help to retrieve that debt. He was also a friend of Brown. Gove applied to him, at first to aid them to buy; and failing in that, urged him to buy the demands for his own benefit. Draper entered into it, and finding the suit of Joy was the great bug-bear to those with whom he was negotiating, doubtless used it much to his advantage. He negotiated between Bennett and Joy, and procured them to agree; to effect which, Joy, who was quite as friendly with Brown as any person who appears here, took Brown’s promise to reduce his bills receivable to the sum which he should receive from the sheriff. It is probable, that Brown gave to Draper strong assurances that he would turn out to him enough to make him good in his purchase; and I have no doubt that Draper relied upon Brown’s honorary obligation, as well as the compulsory obligation of the judgments, to obtain a greater sum than he should pay out for the claims. But that he had any indemnity in hand which secured him, I do not believe.
The purchase was closed, by Draper’s paying $2700 of his own funds, on the 17th February, 1843. Soon after this, Joy paid his acceptances to Brown; and Brown, after keeping the money until June th, paid it over to Draper on account of the demands which had been assigned to the latter. And at the same time, he paid and transferred other funds and securities to Draper, making in the whole about $5500, that was good and available. No doubt Brown aided Draper all he could, in the negotiation with Mr. Bennett; for which there was this plain and obvious reason, that he preferred to have a friend for a ■ creditor, to one who was indifferent or hostile.
It was asked, why did he not pay the Joy bills receivable to the bank, in discharge of the whole 1 The answer is, that he, like Gordon, was wilful and obstinate, and preferred to suffer the load of debt, to discharging it by stripping himself of every thing, and leaving his late partner with property in his hands.
Either of them had a perfect right to pay any sum on the bank debt, or any other debt. Brown, in January, 1843, might with perfect propriety, and without a word of reproach from Gordon, have paid to the bank, on account of those demands, the same $5500, which in June following he paid to Draper; and thereby have left *222 the same amount of debt impending over Gordon and himself, that he did by the payment to Draper. The bank might reasonably complain of his course in preferring Draper to them, but it is difficult to see wherein it has injured Gordon. Brown’s motive unquestionably was, to keep at arms-length with Gordon, believing he could at any time settle his own share of the debts, more readily with his friend, Draper, than he could with his litigant antagonists. He found in Draper a man who was willing to purchase and hold these debts against Gordon and himself.
I do not know of any rule of equity which forbids such a course. There was confidence, no doubt, and an honorary reliance upon each other, existing between Brown and Draper. But so long as Draper paid his own money, and had no legal or equitable right beyond that which was held by the bank, for enforcing or securing the debts, there was no trust in the case, nor any obligation imposed upon him, other than those to which his assignors were subject.
Suppose that Brown, after the assignment to Draper, had taken it into his head to pay the money received from Joy, and all the other funds and securities which he had remaining, to the Bank of Utica, on their debt against Gordon & Brown. It was entirely in his power to have made such a payment. Draper could not have prevented it, by any control he had over those funds. What would have been Draper’s prospect of being reimbursed his $2700, after such an operation ; and what would his honorary pledges, and his promises of indemnity, have been worth to him, after the funds were gone ?
The case of Reed v. Warner, (5 Paige, 650,) was where an agent, employed by the debtors to buy in their debts for their benefit, purchased them in his own behalf. Here there was no agency in the matter. Draper acted for himself throughout, and was at no time the agent of Gordon & Brown, or either of them.
I cannot but think, that Gordon has mistaken the moral and social duties and obligations of his late partner, for those of which equity takes cognizance ; and must say, that in my judgment, the cross bill cannot be sustained on the facts proved.
*223 The complainant in the original suit, is entitled to the usual decree for his debt and costs. His costs in the cross cause, may be included in the decree as a part of those in the creditor’s suit.
The cross bill must be dismissed, but without costs, except as above directed.